IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| C.D., in his own capacity, and N.D., as attorney-in-fact, | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | 1:23-cv-1627 (LMB/JFA) |
| v. | ) | |
| | ) | |
| ARLINGTON COUNTY SCHOOL BOARD; | ) | |
| | ) | |
| Defendant. | | |

MEMORANDUM OPINION

Before the Court are cross motions for judgment on the administrative record in an action brought under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, et seq., in which plaintiffs, a former Arlington County Public School student identified as C.D. and N.D., who is C.D.'s Mother ("plaintiffs"), allege that the Arlington Public School System ("APS" or "defendant")[1] failed to conduct a comprehensive special education reevaluation of C.D. on April 7, 2021, and denied C.D. a free and appropriate public education ("FAPE") in the 2021–2022 and 2022–2023 school years. As a result of these alleged violations of the IDEA, plaintiffs seek an award of costs for compensatory education to compensate C.D. for the education support C.D. should have received while attending an APS high school, as well as attorneys' fees and costs incurred in the administrative proceedings and this litigation.

---

[1] Because it is the proper defendant in a case against a school system, the defendant in this action is the Arlington County School Board; however, references throughout the pleadings and administrative record are to the Arlington Public Schools. References to the administrative record will use AR. References to documents filed in this civil action will use their docket numbers.

Defendant responds that it fully complied with the IDEA by conducting a reasonable special education reevaluation of C.D. in April 2021, and by providing appropriate individualized education programs ("IEPs") for C.D. in the least restrictive environment while C.D. attended APS schools.

Plaintiffs have exhausted the IDEA's required administrative procedures by presenting their claims to an independent hearing officer, who conducted a six-day administrative hearing in which 28 witnesses, whose testimony comprises 1,700 pages of transcripts, testified. The lengthy administrative record also includes 329 exhibits. The hearing officer ruled for plaintiffs on one claim—which the APS does not appeal—and against plaintiffs on all remaining claims. Plaintiffs timely appealed the decision to this Court. Oral argument on the cross motions for judgment has occurred.[2] For the reasons explained below, defendant's Motion for Judgment on the Administrative Record [Dkt. No. 63] will be granted, plaintiffs' Motion for Judgment on the Administrative Record [Dkt. No. 58] will be denied, and judgment will be entered in defendant's favor.

## I. BACKGROUND

### A. **Factual Background**

The following facts are not contested. At all relevant times, C.D. was a resident of Arlington County, Virginia, and attended Arlington County Public Schools. AR 329 at 008. C.D. lived with his/her Mother, who is a lawyer by trade. Id. at 022. Although the Complaint

---

[2] As stated in open court, because, without leave of court, plaintiffs' Memorandum in Support of their Motion for Judgment on the Administrative Record exceeded the 30-page limit and included extensive footnotes in 10-point Roman style font in violation of Local Civil Rule 7(F)(3) for the United States District Court for the Eastern District of Virginia, the Court has not considered the Memorandum's footnotes in reaching its decision.

alleges that defendant denied C.D. a FAPE between April 7, 2021 and June 2023, the record includes the full scope of special education services the APS provided to C.D., beginning in 2013, portions of which are relevant to this litigation.

>    1.   August 2013–April 6, 2021

In August 2013, when C.D. was in the 3rd grade, C.D.'s Mother requested that the APS evaluate C.D. for special education services due to concerns about C.D.'s attention and behavior. AR 106.  A private doctor had diagnosed C.D. with attention deficit hyperactivity disorder ("ADHD"), and the APS eligibility team found C.D. eligible for a Section 504 Accommodation Plan (Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 701 et seq.).  AR 107.  C.D. remained on this plan through 7th grade.  AR 329 at 008.

In preparing C.D. for 8th grade, the APS conducted several evaluations, including an educational evaluation on May 18 and 21, 2018, see AR 44, which showed that C.D.'s reading, written language, and broad mathematics skills were average, whereas reading decoding, spelling, and writing fluency were strengths, and C.D.'s math calculation skills, passage comprehension, and listening comprehension were weaknesses.  AR 329 at 009–010.  No formal speech and language evaluation was conducted.  Id. at 010.

On May 24 and 25, 2018, the APS conducted a psychological evaluation of C.D.  AR 50. The psychological evaluation showed that C.D. had overall cognitive skills within the High Average range; however, C.D. had significant weaknesses in the areas of attention and executive functioning (e.g., initiating tasks, organization, and task-monitoring).  AR 329 at 008–09.

At a special education eligibility meeting for C.D. held on May 30, 2018, the APS compiled these results and determined that C.D. was "eligible for special education and related services" under the Other Health Impairment ("OHI") disability designation, due to ADHD.  Id. at 008.

Based on the eligibility determination, an IEP team met on June 12, 2018 to determine the services C.D. would receive during 8th grade and to create C.D.'s first IEP. Id. at 010. In attendance were C.D.'s Mother, an Educational Advocate she had retained, several of C.D.'s special education and general education teachers, the school psychologist, and other school staff. AR 54. The IEP listed deficits with attention, behavior, organization, cognitive functioning, math calculation, reading comprehension, receptive language, and self-determination, and provided for 15 hours per week of "Specially Designed Instruction" ("SDI") in the general education setting, divided equally between reading, self-advocacy, mathematics, and organization. Id. C.D.'s Mother, her Advocate, and the school staff signed the IEP. Id. By the end of C.D.'s 8th grade year, which was C.D.'s first year with an IEP, C.D. had mastered or shown sufficient progress on every 2018 IEP goal except arriving to class on time. AR 329 at 011. In addition, C.D. had taken the Virginia Standards of Learning tests ("SOLs"). Although C.D. failed the Writing SOL, C.D. passed the other subjects. [Dkt. No. 60] at 2. C.D.'s grades at the end of the 2018–2019 school year were A's and B's except for a D+ in Pre-Algebra and a C in English. AR 329 at 011.

The next IEP meeting occurred towards the end of C.D.'s 8th grade year, on May 10, 2019, in preparation for C.D.'s freshman year. Id. At that meeting, the team reported that C.D.'s 2018 test scores were Low Average for listening comprehension, understanding directions, and oral comprehension. The IEP's updated goals related to math calculation, reading comprehension, self-determination, and attention/organization. Id. As had the previous IEP, the IEP for C.D.'s freshman year provided for 15 hours of SDI. Id. C.D.'s Mother attended the IEP meeting and signed the IEP. Id. A month later, a "Partial IEP Amendment" was signed by several IEP team members—not including C.D.'s Mother—reducing SDI in reading from 3.75

4

hours per week of direct services to 0.5 hours per month on a "consult/monitor" basis. Id. at 012. Although C.D.'s Mother did not sign the partial amendment, there is no evidence in the record that she objected to it.

C.D.'s freshman year IEP was further updated and agreed upon by the APS and C.D.'s Mother on November 18, 2019. Id. at 012. The updated IEP contained goals in math calculation, reading comprehension, self-determination, and attention/organization, with 3.75 hours per week of SDI in the special education setting for organization and 12 hours per week in the general education setting for reading, self-advocacy, mathematics, and organization. Id. at 012–013. An accommodation of a calculator in math was also added. Id. at 013. By the end of freshman year, C.D. received A's and B's in all grade courses, except for a C in Math. Id.

Due to the COVID-19 pandemic, the IEP team met virtually on November 16, 2020 to review C.D.'s proposed IEP for the sophomore year. Id. Most of the IEP's goals remained the same, but the team decided to have C.D. participate in a self-contained Instructional Studies class; C.D. would still participate with non-disabled students in all academic classes. Id. at 014. C.D.'s Mother participated in the meeting and signed the IEP.

### 2. April 7, 2021–August 2023

In the spring of C.D.'s sophomore year, on April 7, 2021, the IEP team conducted C.D.'s triennial reevaluation as required by the IDEA; again, this was done virtually. Id. In advance of the IEP meeting, the team reviewed teacher narratives, C.D.'s IEP progress updates, the 2018 educational and psychological evaluations used to determine C.D.'s eligibility for services under the IDEA, other testing on file, C.D.'s current performance in school, and team input to determine whether C.D. remained eligible for special education services under the OHI classification due to ADHD. Id. at 014–015. The school psychologist suggested that there was sufficient data to consider a specific learning disability ("SLD") for C.D., and the team agreed

5

that C.D. met the criteria for an SLD in reading comprehension and math calculation. Id. C.D.'s

Mother did not ask for C.D. to be retested and did not disagree with these eligibility

determinations. Id. at 015.

Relying on the April 7, 2021 reevaluation data, C.D.'s IEP team met two weeks later to

update the IEP, which update was approved by C.D.'s Mother and the rest of the team. Id.

Goals for reading comprehension and math calculation were reclassified as addressing C.D.'s

SLD rather than OHI. Id. As in the previous IEPs, the team reported that C.D.'s expressive

language and receptive language abilities were age appropriate. As of May 20, 2021, C.D. was

reported to be making satisfactory progress on all of the November 16, 2020 IEP goals. Id. at

016. C.D.'s grades sophomore year were all A's and B's except for C+'s in English and

American Sign Language. Id.

Beginning in November of C.D.'s junior year, C.D.'s Mother emailed C.D.'s teachers

and other staff regarding C.D.'s poor performance in Algebra 2. C.D. had insisted on taking

Algebra 2 over C.D.'s teachers' and C.D.'s Mother's objections and was failing the class. After

several email exchanges, C.D.'s Mother and teachers and C.D. agreed that C.D. would switch to

a lower-level math course designed as a bridge between Algebra 1 and 2. AR 232 at 83–84.

In the spring of C.D.'s junior year, the IEP team met to review C.D.'s IEP. AR 329 at

016. The team reported that C.D. had failed the W!SE Financial Literacy Certification Test. Id.

at 016–017. In this meeting, for the first time, C.D.'s Mother expressed concerns that C.D.

might not graduate with a standard diploma and requested that C.D. be taken out of C.D.'s

current math class to retake it in C.D.'s senior year. Id. at 017. The team reported that C.D. was

still on track for either a standard or advanced diploma and revised the IEP, which looked similar

to previous years' IEPs but with fewer SDI hours (five instead of nine). Id. at 017–018. C.D.'s

Mother signed the IEP. Id. at 018. C.D.'s junior year grades were a B in Chemistry, C's in English, AP History, and American Sign Language, and a failing grade in math. Id. C.D. had 26 tardies during junior year. Id. C.D. ignored the teachers' and C.D.'s Mother's recommendations and chose not to attend summer school to make up the math credit. Had C.D. made up the credit, C.D. would have kept on track for an advanced diploma. Id. at 021. C.D. failed the junior year Writing SOL. [Dkt. No. 60] at 22.

On December 15, 2022 of C.D.'s senior year, the IEP team met. In attendance was C.D.'s Mother and an Educational Advocate who expressed concern, for the first time, that no additional testing of C.D. had been done as part of the April 7, 2021 triennial reevaluation and, also for the first time, raised concerns about C.D.'s speech and oral language. The Advocate requested that the APS conduct an updated evaluation. On January 13, 2023, the APS denied the Advocate's request, claiming that there was "no evidence that additional evaluations were required to review Student's annual IEP." AR 329 at 020. On January 20, 2023, counsel for plaintiffs wrote the APS that C.D.'s Mother disagreed with the April 7, 2021 reevaluation and requested an Independent Educational Evaluation ("IEE") at public expense. Id. In a January 24, 2023 email, the APS declined to conduct an IEE, responding to plaintiffs' counsel that the request for an IEE "was not related to recent evaluations conducted by APS." Id. C.D.'s Mother invoked the IDEA's due process procedures and, on April 13, 2023, after a prehearing conference in advance of a due process hearing, the APS agreed to provide psychoeducational and speech and language IEEs. Id. The IEEs were completed on May 8, 2023 (psychoeducational) and June 5, 2023 (speech and language). Id.

C.D.'s final IEP was prepared in March of C.D.'s senior year, before the IEEs were conducted. It was substantially similar to previous years' IEPs. Id. at 021. C.D.'s Mother

received the IEP but did not consent to it.  Id.  C.D.'s senior year grades were C+ in Physics, A's

in English and Journalism, D+ in Government, and B+ in Math.  Id. at 019–020.  Although

C.D.'s score for the senior year Writing SOL had improved from prior years, it remained just

below passing.  [Dkt. No. 60] at 22.  C.D. graduated from high school with a standard diploma in

June 2023 and enrolled in a community college.  Id. at 19–20.

Throughout the decade C.D.'s Mother engaged with the APS about C.D.'s special

education services (2013–2023), the APS periodically provided her with the Virginia Procedural

Safeguards Notice ("Safeguards") for parents of children with disabilities as required by the

IDEA and Virginia regulations.  AR 329 at 022.  The Safeguards explained parents' recourse if

they disagreed with special education decisions.  C.D.'s Mother testified during the

administrative hearing that she had read the Safeguards and understood that if she had a

disagreement with special education related decisions, she had some recourse.  Id.

### B. The Hearing Officer's Decision

On April 7, 2023, C.D.'s Mother, through counsel, filed a Request for Due Process

Hearing pursuant to the IDEA in which she raised the following issues:

1. Whether APS denied the student a FAPE by failing to comprehensively assess
   [him/her] in all areas of suspected disability when APS conducted its reevaluation of
   [him/her] on April 7, 2021;

2. Whether APS denied the student a FAPE by significantly impeding the parent's
   ability to fully participate in the IEP process by denying her December 15, 2022,
   request that the student be reevaluated;

3. Whether APS denied the student a FAPE by significantly impeding the parent's
   ability to fully participate in the IEP process by failing to provide an IEE at public
   expense when requested by the parent in January 2023; and

4. Whether APS denied the student a FAPE for the 2021–2022 and 2022–2023 school
   years by failing to meet the student's individual needs, in that the IEP teams
   continued to rely on outdated assessments to develop the IEP[s], failed to provide the
   special education and related services necessary to prepare the student for future
   education, reduced specially designed instruction services year after year with no

> objective data to support this reduction in service, and provided no reading, writing,
> or math remediation to the student during the service minutes identified in [his/her]
> IEPs despite documented evidence of [his/her] deficits in these areas.

Id. at 007.

The hearing officer broke his decision into five sections presented in a different order than the four issues listed above, with issue 4 separated into Sections IV and V. In Section I, he found that C.D.'s Mother was "estopped from claiming, in April of 2023, that the April 7, 2021 reevaluation was not sufficiently comprehensive when Mother could [have] requested additional assessments earlier." Id. at 024. He also concluded that, "[e]ven if the parent were not estopped from challenging the scope of the April 2021 triennial assessments," she had "not met her burden of persuasion that APS' April 2021 reevaluation of Student was not sufficiently comprehensive." Id.

In Section II, he rejected plaintiffs' claims that the 2021–2022 and 2022–2023 IEPs failed to meet C.D.'s individual needs. Specifically, he found that C.D.'s Mother had failed to "establish[] that the APS IEP team relied on outdated assessments to develop the IEPs or otherwise failed to review the scope of data required to be considered under the IDEA." Id. at 034. Contrary to plaintiffs' position, he found that the "offer of services in the April 23, 2021 IEP was sufficiently clear on its face" to allow C.D.'s Mother to decide whether to challenge or accept those services. Id. at 034–035. He also found that C.D.'s Mother had "not established that APS failed to comply with the IDEA's procedural requirements in developing the April 23, 2021, March 17, 2022 and March 21, 2023 IEPs," and rejected her claims of substantive IDEA violations: "Petitioner failed to meet her burden of proof that the IEPs for the 2021–2022 and 2022–2023 school years were inappropriate." Id. at 036. Although the hearing officer concluded that C.D.'s Mother was estopped from challenging the scope of the eligibility evaluation, he did find that she was not estopped from challenging the substantive

9

appropriateness of the IEPs simply because she had consented to them.  Id. at 037.  On the merits, he found that C.D.'s Mother failed to show "that the respective IEP programs were not reasonably calculated to enable [C.D.] to achieve passing marks and advance from grade to grade."  Id. at 040.

In Section III, the hearing officer found in C.D.'s Mother's favor on one issue because during the 2021–2022 school year, the APS "fail[ed] to implement a substantial provision of Student's IEP," amounting to "a denial of FAPE," by not providing C.D. with approximately 35 hours of SDI in the co-taught general education setting as required by C.D.'s IEP.  Id. at 042. Accordingly, he awarded C.D. 35 hours of compensatory education tutoring to compensate for the missed SDI in the 2021–2022 school year.[7]  Id. at 050–051.  In all other respects the hearing officer found in favor of the APS and denied further relief.  Id. at 051.

In Section IV, the hearing officer found that the APS neither denied C.D. a FAPE, caused a deprivation of educational benefits, nor significantly impeded C.D.'s Mother's right to participate in the IEP process when the APS denied C.D.'s Mother's December 15, 2022 request to have C.D. reevaluated.  Id. at 045.  In Section V, the hearing officer found that plaintiffs' claim that the APS denied C.D. a FAPE by failing to provide an IEE when C.D.'s Mother first requested it was moot because the APS eventually provided an IEE.  Id. at 046–047.

On November 29, 2023, plaintiffs filed the instant two-count Complaint seeking judicial review of the hearing officer's decision in favor of the APS.  [Dkt. No. 1].  In Count I, the Complaint alleges that the APS committed five procedural violations of the IDEA, and in

---

[7] On November 6, 2023, the parties entered into a Settlement Agreement and Limited Release of Claims regarding attorneys' fees relating to, and payment of relief granted in, Section III of the hearing officer's decision.

Count II it alleges three substantive violations of the IDEA resulting in C.D. being denied a

FAPE. The five procedural claims alleged in Count I are:

A. APS denied [C.D.] a FAPE by failing to comprehensively assess [him/her] in all areas of suspected disability when it conducted its evaluation of [him/her] on April 7, 2021;

B. APS denied [C.D.] a FAPE by denying the Parent's December 15, 2022, request that [C.D.] be reevaluated;

C. APS significantly impeded the Parent's ability to fully participate in the IEP process by failing to provide an IEE at public expense when requested by the Parent;

D. APS's 2021–2022 and 2022–2023 IEPs denied [C.D.] a FAPE by failing to meet [his/her] individual needs by continuing to rely on outdated assessments to develop [his/her] IEPs; and

E. APS's March 17, 2022 IEP and subsequent proposed IEPs denied [C.D.] a FAPE because the provisions in the IEP for specially designed instruction were so vague that the Parent could not properly evaluate the school's offer of FAPE or monitor over time whether the school was actually providing those services.

Id. at 20, 27, 31, 34–35. The three substantive claims alleged in Count II are that C.D.'s 2021–

2022 and 2022–2023 IEPs denied C.D. a FAPE by:

A. failing to meet [C.D.'s] individual needs by denying [C.D.] the special education and related services necessary to prepare [him/her] for future education;

B. reducing specially designed instruction services year after year with no objective data to support this reduction in service; and

C. providing no reading, writing, or math remediation to the student during the service minutes identified in [the] IEPs despite documented evidence of [C.D's] deficits in these areas.

Id. at 39, 42–43. For relief, the Complaint seeks: "$59,920 for compensatory education in the

form of 441 hours of private tutoring or executive function coaching at a rate of $120 per hour to

address C.D.'s identified areas of need: executive functioning, self-advocacy, reading, writing,

and math; $31,200 for compensatory education to address [C.D.'s] Mixed Receptive-Expressive

Language Disorder in the form of 208 hours of speech therapy at a rate of $150 per hour for one

hour per week for four years, year round, by a private speech language pathologist; and attorneys' fees and costs, including those incurred with the due process proceedings before the hearing officer, totaling approximately $167,000." Id. at 48.

## II. DISCUSSION

### A. Standard of Review

Although IDEA cases are original civil actions, they are adjudicated based upon the record developed in the administrative proceedings. Cnty. Sch. Bd. of Henrico Cnty. v. Z.P. ex rel. R.R., 399 F.3d 298, 309 n.7 (4th Cir. 2005); M.B. v. Fairfax Cnty. Sch. Bd., 660 F. Supp. 3d 508, 513 (E.D. Va. 2023). Accordingly, judicial review "may be conducted on the administrative record even if there are disputed issues of material fact." Indep. Sch. Dist. No. 283 v. S.D., 88 F.3d 556, 561 (8th Cir. 1996); Fairfax Cnty. Sch. Bd. v. A.G., 2022 WL 4016882, at *1 (E.D. Va. 2022); A.P. ex rel. L.P. v. Sch. Bd. of Fairfax Cnty., 2022 WL 1105076, at *8 (E.D. Va. 2022). Consistent with that procedure, the parties have agreed in their court-approved Joint Discovery Plan that this civil action should be decided based on the administrative record without the need for trial. [Dkt. No. 13] at Sec. 10; [Dkt. No. 14].

Plaintiffs, as the parties challenging the hearing officer's decision, bear the burden of establishing that the decision was erroneous. Barnett v. Fairfax Cnty. Sch. Bd., 927 F.2d 146, 152 (4th Cir.), cert. denied, 502 U.S. 859 (1991). A district court reviewing a hearing officer's decision under the IDEA "conducts modified de novo review, giving due weight to the underlying administrative proceedings." O.S. v. Fairfax Cnty. Sch. Bd., 804 F.3d 354, 360 (4th Cir. 2015) (internal quotations omitted). "[A]dministrative findings in an IDEA case are entitled to prima facie correctness, and the district court, if it is not going to follow them is required to explain why it does not." A.B. ex rel. D.B. v. Lawson, 354 F.3d 315, 325 (4th Cir. 2004)

12

(quoting <u>Doyle v. Arlington Cnty. Sch. Bd.</u>, 953 F.2d 100, 105 (4th Cir. 1991)) (internal quotations omitted). "[F]actual findings made during the state administrative proceeding are entitled to a presumption of correctness, so long as the findings were 'regularly made.'" <u>Z.P.</u>, 399 F.3d at 305 (quoting <u>Doyle</u>, 953 F.2d at 105). "The hearing officer's conclusions of law, however, merit no such deference; the court draws its own legal conclusions <u>de novo</u>." <u>Alexis v. Bd. of Educ. for Baltimore Cnty. Pub. Schs.</u>, 286 F. Supp. 2d 551, 556 (D. Md. 2003) (citing <u>Doyle</u>, 953 F.2d at 105).

Plaintiffs bear the burden of proving that a hearing officer's factual findings are not "regularly made." "Factual findings are not 'regularly made' if they are reached through a process that is 'far from the accepted norm of a fact-finding process.'" <u>Id.</u> (quoting <u>Doyle</u>, 953 F.2d at 104); <u>see also</u> <u>J.P. v. Cnty. Sch. Bd. of Hanover</u>, 516 F.3d 254, 259 (4th Cir. 2008). In reviewing the administrative record, courts must give due regard to the hearing officer's findings because he had the opportunity to hear the testimony and assess the weight and credibility of the witnesses. <u>See</u> <u>Doyle</u>, 953 F.2d at 104–05; <u>A.B.</u>, 354 F.3d at 327–28; <u>Z.P.</u>, 399 F.3d at 306–07 ("We have held that credibility determinations implicit in a hearing officer's decision are as entitled to deference under <u>Doyle</u> as explicit findings.").

## B. <u>Statute of Limitations</u>

Plaintiffs filed their administrative due process complaint on April 7, 2023. AR 329 at 004. The IDEA provides a two-year statute of limitations during which a parent may bring a due process complaint against a school district. <u>Torda v. Fairfax Cnty. Sch. Bd.</u>, 2012 WL 2370631, at *8 (E.D. Va. 2012), <u>aff'd</u> 517 F. App'x. 162 (4th Cir. 2013) ("A two-year statute of limitations applies to the submission of this complaint, requiring the violation alleged to have 'occurred not more than 2 years before the date the parent or public agency knew or should have known about the alleged action that forms the basis of the complaint[.]'") (citing 20 U.S.C. § 1415(b)(6)(B)).

13

Plaintiffs were aware of the facts giving rise to their claims at the time of each eligibility and IEP meeting.

Although plaintiffs have brought timely claims relating to events occurring after April 7, 2021, a significant portion of these claims rely on assertions that the 2018 triennial eligibility evaluation was defective because it should have included a speech and language assessment, and that the data collected in 2018 put the APS on notice (a "big red flag") that further testing was necessary. [Dkt. No. 60] at 12, 23. Even though the hearing officer properly cabined his decision to facts and actions that occurred on or after April 7, 2021, AR 329 at 029–032, plaintiffs continue to raise time-barred issues in their briefs. C.D.'s Mother was fully aware of the APS not retesting C.D. in 2018 because she attended the follow-up IEP meeting at which she had the assistance of an Educational Advocate, received copies of the evaluation reports, and voiced no objections to either the evaluation or to the resulting IEPs. Therefore, her opportunity to complain about the 2018 eligibility evaluation decisions expired in 2020, and the hearing officer's conclusion that this issue was time-barred was correct.

### C. **Equitable Estoppel: The Eligibility Decision**

The Complaint's first claim is that the "APS denied the Student a FAPE by failing to comprehensively assess [him/her] in all areas of suspected disability when it conducted its evaluation of [him/her] on April 7, 2021." [Dkt. No. 1] at 20. The hearing officer correctly found that C.D.'s "Mother is estopped from claiming, in April 2023, that the April 7, 2021 reevaluation was not sufficiently comprehensive when Mother could [have] requested additional assessments earlier." AR 329 at 024 (citing XXXXXX by Smith v. Arlington Cnty. Sch. Bd., 2021 WL 2324164, at *11 (E.D. Va. 2021)).

Estoppel is an equitable doctrine, meaning a court must consider principles of fairness as to both parties. "Equitable estoppel precludes a party from asserting rights he otherwise would

have had against another when his own conduct renders assertion of those rights contrary to equity." Am. Bankers Ins. Grp., Inc. v. Long, 453 F.3d 623, 627 (4th Cir. 2006).[9] The parties to litigation need not know of the existence of equitable estoppel for a court to apply the doctrine to them; rather, the doctrine reflects the notion that it is unfair to allow a party to take a factual position, (e.g., "I agree with the decision not to test") and at a later time take a contrary position ("I disagree with the decision not to test"), especially when another party—here, the APS— reasonably relied on the first position. Because estoppel is an equitable doctrine, this Court need not, and does not, pronounce a generally applicable rule of law as to when a parent is estopped from challenging the scope of a special education eligibility determination. Instead, the facts and circumstances presented in this record fully support the hearing officer's conclusion that C.D.'s Mother—a lawyer by trade who had used the services of an Educational Advocate—is estopped from challenging the IEP decisions to which she had agreed every year until December of C.D.'s senior year.

The record shows that C.D.'s Mother reviewed the existing data the eligibility team used, participated in the decision about whether to gather additional data, and did not ask for additional data to be gathered. AR 78-003. Moreover, she admitted during her testimony before the hearing officer that she had read the Safeguards the APS provided to her[10] and was aware of her

_____

[9] Long involved a motion to compel arbitration wherein the defendants argued they were not signatories to the arbitration clause while simultaneously relying on other terms of the underlying agreement for their other claims. Id. at 626. The court found that the defendants were estopped from disaffirming the arbitration clause within an agreement they otherwise affirmed. Id. at 630.

[10] Plaintiffs argue that equitable estoppel ought not apply to C.D.'s Mother's repeated decisions to approve C.D.'s IEPs because the Safeguards do not mention equitable estoppel. [Dkt. No. 66] at 6. Contrary to plaintiffs' argument, notice of the doctrine of equitable estoppel by a party is not required for a court to apply the doctrine to that party, and, as a practicing attorney, C.D.'s Mother should be aware of this well-known legal doctrine.

right to request that additional data be collected, yet she neither disagreed with the decision nor requested that additional data be collected. Id. Even in this litigation C.D.'s Mother has not disagreed with the underlying determinations that C.D. was eligible for services under the ADHD and SLD categories; rather, she retrospectively disagrees with the decision not to test C.D. for other disabilities. AR 329 at 015. The hearing officer correctly found "no evidence that Mother requested additional assessments at the time, or that she ever disagreed with the IEP team's decisions." Id. at 024. The Court's review of the record yields the same conclusion. Finally, C.D.'s Mother signed both the April 23, 2021 IEP, which was based on the April 7, 2021 reevaluation, and the March 17, 2022 IEP. In fact, for the entirety of C.D.'s junior year and almost half of C.D.'s senior year, the APS implemented the agreed-upon IEPs to support C.D.'s agreed-upon disabilities, without any objection from C.D.'s Mother.

Other decisions in this Circuit support the conclusion that C.D.'s Mother is equitably estopped from contesting the adequacy of the April 7, 2021 reevaluation of C.D. In Smith, the parents (on behalf of their minor child enrolled in Arlington Public Schools) had consented to all IEPs until, nearly a year after the most recent IEP, they filed for a due process hearing to challenge the consented-to IEPs. 2021 WL 2324164, at *11. The Court affirmed the hearing officer's rejection of the parents' challenge, concluding that "the Parents are precluded from asserting claims as to the 2017–2018 school year under agreed IEPs, or portions of IEPs with which they did not disagree." Id. at *11. As the Smith decision explained, "courts have held that parties are estopped from challenging prior agreed eligibility determinations or IEPs for lacking certain goals or services where they did not promptly utilize the administrative remedies for which they had notice." Id. (citing Bd. of Educ. v. Brett Y., 155 F.3d 557 (4th Cir. 1998)). Similarly, "[t]he Fourth Circuit has affirmed a district court's decision 'declin[ing] to use . . .

16

evidence to Monday-morning quarterback the school system'" when that evidence "arose only after the IEP was created." Id. (quoting Schaffer v. Weast, 554 F.3d 470, 475–77 (4th Cir. 2009)).

Arguing that estoppel is improper in this context, plaintiffs rely on G ex rel. RG v. Fort Bragg Dependent Schools, 343 F.3d 295 (4th Cir. 2003), in which the Fourth Circuit reversed a district court's conclusion that "an award of compensatory education was inappropriate in this case because G's parents failed to object during the 1994–1996 school years to the IEPs." Id. at 309.  The issue in Fort Bragg was whether the parents' prior consent to IEPs categorically barred a compensatory education remedy in a context where the IEP did not satisfy the IDEA.[11]  Fort Bragg does not help plaintiffs because in C.D.'s case, the hearing officer thoroughly reviewed the record, evaluated the adequacy of the IEPs at issue, and applied the proper standards to find that the eligibility evaluation and the resulting IEPs satisfied the IDEA.

Plaintiffs also rely on several out-of-circuit cases that are inapposite to this action.  In Draper v. Atlanta Independent School System, 518 F.3d 1275 (11th Cir. 2008), the school district was found to have misdiagnosed a significantly disabled student, failed to timely reevaluate the student, and admitted multiple IDEA violations.  Id. at 1283.  Under those facts, the school district's statute of limitations defense was rejected.  J.R. ex rel. Perez v. Ventura Unified School District, 668 F. Supp. 3d 1054 (C.D. Cal. 2023) involved a school district's failure to test a child for autism during an eligibility evaluation, and the parent's successful challenge to the school district's statute of limitations defense.  Id. at 1061, 1071.  Finally, the

---

[11] The court in Fort Bragg found that the district court had not applied the proper standard to determine whether the school's implementation of the IEP provided a FAPE.  Id. at 308 ("This is an unusual case in that . . . none of the decisions below reflect a thorough assessment of the evidence under the proper standard"—whether the IEP was "reasonably calculated to provide educational benefit.").

court in <u>A.G. ex rel. Grundemann v. Paradise Valley Unified School District No. 69</u>, 815 F.3d 1195 (9th Cir. 2016) found that parental consent to a school placement decision did not waive the parents' right to challenge that decision "without [also] evaluating whether A.G.'s educational needs were met." <u>Id.</u> at 1205–06.  None of these cases is analogous to the instant civil action.

Plaintiffs further argue that the hearing officer committed an error of law because "[t]he IDEA provides a 2-year statute of limitations period for requesting due process for any matter related to the identification or evaluation of a student" without exceptions for parents who consent, and plaintiffs raised these issues in their due process complaint within the two-year limitations period, [Dkt. No. 66] at 9, and contend that "[t]he IDEA does not impose an additional requirement that a parent must explain why they did not bring a challenge earlier, as suggested by the School Board, nor does it carve out exceptions that shorten the 2-year statutory limitations period." <u>Id.</u> at 10.

The plaintiffs' arguments ignore the function of equitable estoppel.  As explained above, "[e]quitable estoppel precludes a party from asserting rights [s]he otherwise would have had against another when [her] own conduct renders assertion of those rights contrary to equity." <u>Long</u>, 453 F.3d at 627.  At issue is whether C.D.'s Mother's conduct renders it "contrary to equity" to allow her to assert "rights [s]he otherwise would have had against" the APS. <u>Id.</u>  For the reasons stated above, it is contrary to equity to allow plaintiffs to "Monday-morning quarterback" decisions they initially agreed with and did not dispute for years despite being sufficiently informed about their right to challenge those decisions.

**D. Reevaluation Decision**

The U.S. Department of Education IDEA regulations require that school districts:

(1) Use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information about the child, including information provided by the parent, that may assist in determining—

    (i)  Whether the child is a child with a disability under § 300.8; and

    (ii) The content of the child's IEP, including information related to enabling the child to be involved in and progress in the general education curriculum . . .;

(2) Not use any single measure or assessment as the sole criterion for determining whether a child is a child with a disability and for determining an appropriate educational program for the child; and

(3) Use technically sound instruments that may assess the relative contribution of cognitive and behavioral factors, in addition to physical or developmental factors.

34 C.F.R. § 300.304(b).  Evaluations, including triennial reevaluations, must be "administered by trained and knowledgeable personnel."  34 C.F.R. § 300.304(c).  School districts must also ensure that students are "assessed in all areas related to the suspected disability," 20 U.S.C. § 1414(b)(3)(B), but these assessments need not be formal.  The U.S. Department of Education's Office of Special Education Programs' Letter to Anonymous, 48 IDELR 136, 107 LRP 45732 (OSEP Feb. 6, 2007) found that a review of extant data alone may suffice in certain circumstances:

If the IEP Team and other qualified professionals, as appropriate, determine that no additional data are needed to determine whether the child continues to be a child with a disability, and to determine the child's educational needs, the public agency must notify the child's parents of: (i) that determination and the reasons for the determination; and (ii) the right of the parents to request an assessment to determine whether the child continues to be a child with a disability, and to determine the child's educational needs. 34 CFR § 300.305(d)(1). Under these circumstances, the public agency is not required to conduct assessment unless requested to do so by the child's parents. 34 CFR § 300.305(d)(2). If the parents do not request an assessment, then the review of existing data may constitute the reevaluation.

Id.

Even though he found that plaintiffs were estopped from challenging the decision not to test C.D. for speech or language disabilities as part of the April 7, 2021 triennial reevaluation, the hearing officer fully evaluated the IEPs that followed, as well as C.D.'s performance, and concluded that the APS did not deny C.D. a FAPE and that C.D.'s Mother did "not [meet] her burden of persuasion that APS' April 2021 reevaluation of Student was not sufficiently comprehensive." AR 329 at 024.

The hearing officer found, and upon careful review of the record the Court agrees, that the APS satisfied all U.S. Department of Education regulations and IDEA requirements by considering an appropriate "variety of assessment tools and strategies to gather relevant functional, developmental, and academic information about" C.D. in making its eligibility determinations, and by following appropriate procedures in determining that no further testing was needed. AR 329 at 026–032. For example, the hearing officer heard evidence from the APS's expert witness, the school psychologist who was present at the April 7, 2021 reevaluation. He testified that there was no question regarding C.D.'s disability eligibility and therefore no need for additional data or further testing. Id. at 027. The hearing officer also heard from plaintiffs' private psychologist, Dr. Henley, who was qualified as an expert in clinical psychology but was not present at the eligibility meeting. Id. at 029. He testified that although he agreed with the eligibility conclusion, he would have recommended new testing had he been present because C.D.'s 2018 test scores suggested deficiencies in C.D.'s "speech and language function." Id. at 030.[12]

---

[12] Dr. Henley concluded that C.D.'s 2018 test scores raised "enough red flags that a speech language evaluation would be warranted." AR 234-106.

Notably, the hearing officer found the testimony of the school psychologist more reliable because he, unlike the private clinical psychologist, was an expert in psychological and educational assessments and was present at the reevaluation meeting.[13]  The hearing officer also observed that previous IEPs had reported that C.D.'s expressive and receptive language abilities were "age appropriate," and neither C.D.'s teachers nor C.D.'s Mother had reported concerns in these areas.  Id. at 031.  Because the IEP team, which included an expert qualified in psychological and educational assessments, determined that no additional data was needed, and C.D.'s Mother did not request any further assessment, plaintiffs have "not established that at the time of the April 2021 triennial reevaluation, [C.D.] had suspected speech or language needs that would have triggered a requirement for APS to conduct a speech and language evaluation."  Id. For these reasons, the hearing officer correctly concluded that the APS did not deny C.D. a FAPE by choosing not to conduct additional tests as part of the April 7, 2021 eligibility evaluation.

### E.  The December 15, 2022 Request to Reevaluate C.D.

The Complaint's second claim is that the APS denied C.D. a FAPE by denying C.D.'s Mother's request, made on December 15, 2022, to have C.D. reevaluated.  [Dkt. No. 1] at 27. Although the hearing officer found that the APS's failure to test C.D. timely was a procedural violation of the IDEA, he also found that the procedural violation did not deny C.D. a FAPE. AR 329 at 044–046.

---

[13] Making conclusions about the reliability of witness testimony and accepting one expert's view over another's are quintessential examples of "regularly made" findings in properly conducted administrative and judicial proceedings.  Here, the reasons offered for accepting defendant's expert over plaintiffs' expert were fully supported by the record.

The IDEA requires that a reevaluation of a child with a disability occur once every three years, or sooner if the parent requests reevaluation (not to exceed once per year). See 34 C.F.R. § 300.303. Although the IDEA does not set a timeframe for a school to act on a parent's reevaluation request, Virginia regulations require that reevaluations be completed within 65 business days of receipt of the parent's request. See Regulations Governing Special Education Programs for Children with Disabilities in Virginia, 8 VAC 20-81-70(h)(2) (2010).

"Under the IDEA, . . . [when] a procedural defect exists, [the court is] obliged to assess whether it resulted in the loss of an educational opportunity for the disabled child, or whether, on the other hand, it was a mere technical contravention of the IDEA." MM ex rel. DM v. Sch. Dist. of Greenville Cnty., 303 F.3d 523, 533 (4th Cir. 2002). A hearing officer may find that a child did not receive a FAPE due to a procedural violation only if the violation:

 a. Impeded the child's right to a FAPE;

 b. Significantly impeded the parent's opportunity to participate in the decision-making process regarding the provision of a FAPE to the parent's child; or

 c. Caused a deprivation of educational benefits.

20 U.S.C. § 1415(f)(3)(E)(ii). As the word "or" indicates, any one of these three results would constitute an IDEA violation.

Had the APS complied with C.D.'s Mother's request when it was made on December 15, 2022,[14] the 65-business day deadline for completion of the assessment would have been

---

[14] C.D.'s Mother asserts that she requested an expedited schedule, and that the APS had operated on a shorter timeline in the past. The APS does not dispute that it had operated on an expedited timeline in the past but argues that it cannot be held liable for its failure to exceed IDEA requirements; it is only liable for failure to meet the requirements.

March 22, 2023.[15]   AR 329 at 045.  After any new assessment, the IEP team would have needed

time to evaluate the new information and to schedule a meeting to revise C.D.'s IEP.  Such a

meeting can take up to 30 days to schedule.  See 8 VAC 20-81-110(B)(2)(c).  Had the defendant

complied with plaintiffs' request within the time limits permitted, any change to C.D.'s IEP

would, at best, have become effective mid-April 2023, quite late in C.D.'s senior year.  The

hearing officer reasonably concluded that the duration of any new support for C.D. would have

been only "a few weeks" before C.D. graduated on June 14, 2023.  AR 329 at 045.  More

precisely, there would have been only a few weeks between when the new testing results could

have been integrated in C.D.'s IEP and June 9, which was the last day of classes for seniors.[16]

See AR 233 at 119.

        The record in this case does not show that the lack of new testing data during the final

weeks of C.D.'s senior year "significantly impeded the parent's opportunity to participate in the

decision-making process" or "caused a deprivation of educational benefits."  20 U.S.C.

§ 1415(f)(3)(E)(ii).  The Complaint alleges that absent new testing data, C.D.'s Mother's ability

to participate in the process as mandated by the IDEA was significantly impeded because she

"had no information about [C.D.'s] current areas of deficit which would need to be addressed in

the IEP."  [Dkt. No. 1] at 30 (emphasis in original).  This claim is vastly overstated.  As

discussed above, the IEP team—including C.D.'s Mother—examined multiple data points

related to C.D.'s senior year, including current information about C.D.'s academic and

---

[15] The hearing officer found that the assessment results would have been available by March 9, 2023, based on the December 15, 2022 request.  This was inaccurate.  Excluding weekends and federal holidays, 65 business days after December 15, 2022 was March 22, 2023.

[16] There is evidence in the record that final exams and other year-end activities occurred in C.D.'s classes during the last week of school.  See, e.g., AR 187-008 (Detailed Progress Report in English).

behavioral performance.  Accordingly, the hearing officer's conclusion that the APS's failure to

agree to test C.D. until April 13, 2023 did not "significantly" impede C.D.'s Mother's

opportunity to participate in the IEP process was reasonable and well supported by the record.

The Complaint also alleges that C.D. was deprived of educational benefits by not

receiving interventions for a Mixed Receptive-Expressive Language Disorder that would have

been revealed had the APS timely provided additional testing as required by the IDEA.  [Dkt.

No. 1] at 29.  An IEP "reasonably calculated to enable a child to make progress appropriate in

light of the child's circumstances" need not provide "ideal" educational benefits.  Endrew F. ex

rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1, 580 U.S. 386, 399 (2017).  "Appropriate

progress" for a student integrated into the general education curriculum is "passing marks and

advance[ment] from grade to grade."  Id. at 401.  The missing educational benefits the Complaint

alleges are in the receptive and expressive language categories, yet C.D. passed all senior year

classes, including receiving an A in English.  Even accepting as true plaintiffs' claim that C.D.'s

final IEP would have included additional interventions had the APS timely tested C.D., the

actual IEP was still "reasonably calculated to enable" appropriate progress, evidenced by C.D.'s

grades and receipt of a standard diploma.  C.D.'s IEP for the last seven weeks of senior year may

not have been ideal, but an ideal outcome is not the legal standard for judging the adequacy of an

IEP.  The hearing officer reasonably concluded that C.D.'s senior year IEP provided a FAPE and

the record supports that conclusion.

During oral argument, plaintiffs' counsel argued that allowing the APS to violate the

IDEA with impunity during the second half of C.D.'s senior year would set a bad precedent for

school districts, incentivizing them to delay testing and ignore the needs of students in their last

semester of high school.  [Dkt. No. 72].  Plaintiffs' counsel is correct that school districts should

be held accountable to provide a FAPE to their students through graduation, but that is what the

APS did for C.D., and the record shows that C.D. did receive all the services provided for in the

IEP.  As discussed above, a school district may provide a student with a FAPE despite flaws in

that student's education, and not every procedural violation of the IDEA results in a denial of a

FAPE.  Although the APS improperly delayed in granting plaintiffs' request to have C.D.

reevaluated, the APS still provided C.D. with a FAPE.

### F.   The APS's Delay in Providing an IEE

The Complaint's third claim is that the "APS significantly impeded the Parent's ability to

fully participate in the IEP process by failing to provide an IEE at public expense when requested

by the Parent" on January 20, 2023.  [Dkt. No. 1] at 31.  Federal regulations require schools

either to provide the IEE at public expense "without unnecessary delay" or to "[f]ile a due

process complaint to request a hearing to show that its evaluation is appropriate."  34 C.F.R.

§ 300.502(b)(2).  On January 20, 2023, C.D.'s Mother (by counsel) requested that the APS

conduct an IEE, which the APS refused to do until April 13, 2023, after the prehearing

conference for the due process hearing, and those evaluations were completed on May 8, 2023

and June 5, 2023, shortly before C.D. graduated.  AR 329 at 046.

#### 1.   Mootness

The hearing officer found that this claim was moot because the APS ultimately provided

an IEE at public expense.  AR 329 at 046–048.  "[T]he doctrine of mootness constitutes a part of

the constitutional limits of federal court jurisdiction, which extends only to actual cases or

controversies."  Porter v. Clarke, 852 F.3d 358, 363 (4th Cir. 2017) (citations and internal

quotation marks omitted).  "Thus, federal courts lack jurisdiction when 'the issues presented are

no longer "live" or the parties lack a legally cognizable interest in the outcome.'"  Johnson v.

Charlotte-Mecklenburg Sch. Bd. of Educ., 20 F.4th 835, 842 (4th Cir. 2021) (quoting Leaders of

a Beautiful Struggle v. Balt. Police Dep't, 2 F.4th 330, 336 (4th Cir. 2021) (en banc) (citation omitted)).

The Complaint alleges that the APS unnecessarily delayed providing the IEE, and if it had been timely provided, C.D.'s Mother would have been more informed in the IEP process and C.D. would have received additional educational benefits. [Dkt. No. 1] at 34. As a transcript of the January 5, 2023 meeting with APS staff, C.D., C.D.'s Mother, and her advocate showed, when plaintiffs requested an IEE, the request was made, in part, to facilitate C.D. obtaining accommodations in college the following year. See AR 225-019; see also AR 235-118–19; AR 131. Near the end of the meeting, the Educational Advocate stated: "We're asking for [testing.] I mean, [C.D.] needs updated testing that has to be less than two years old in order to get college accommodations. . . . [T]hey're not gonna take 2018 testing." AR 225-019. The APS student support coordinator, Krystal Hines, responded that the school system was not required to provide such testing for college. Id.

Because mootness is a legal claim, the Court reviews this finding de novo and concludes that C.D.'s Mother's claim became moot in this case when the IEE was eventually provided. The benefits plaintiffs sought from a new IEE were not only to obtain a modified IEP that provided additional services for a few weeks of C.D.'s senior year but also a basis for seeking accommodations for C.D. in college. The plaintiffs did, in fact, receive benefits from the delayed IEE in having the updated testing available to help C.D. get accommodations in college.

The IEP team, including C.D.'s Mother, updated C.D.'s IEP on March 21, 2023 using a variety of data, including C.D.'s course grades, teacher observations, and standardized and course-specific assessments. See AR 194, 229. Accordingly, plaintiffs have not met their burden of showing that the APS's delay—whether a procedural violation or not—impeded

C.D.'s right to a FAPE, caused a deprivation of educational benefits, or significantly impeded

C.D.'s Mother's right to participate in the decision-making process.

      2.  <u>Regularly Made Factual Findings</u>

      Plaintiffs try to undermine the hearing officer's report by complaining that one of his

factual findings about the IEE reports was not "regularly made" because it was "demonstrably

inaccurate." [Dkt. No. 66] at 5. In the Fourth Circuit, administrative findings are regularly made

if "the hearing officer conducted a proper hearing, allowing the parents and the School Board to

present evidence and make arguments, and the hearing officer by all indications resolved the

factual questions in the normal way, without flipping a coin, throwing a dart, or otherwise

abdicating his responsibility to decide the case." <u>J.P.</u>, 516 F.3d at 260. Accordingly, if a hearing

officer engages in a normal fact-finding process, his factual findings are regularly made.

      The factual error plaintiffs allege was, in fact, not an error. The hearing officer wrote that

the IEE evaluation reports were completed on May 8, 2023 and June 5, 2023. [Dkt. No. 66] at 5.

Those dates are the dates reflected on the reports; however, plaintiffs argue in their opposition

memorandum that the evaluation reports were provided to the parties in an email on June 9,

2023, and therefore were not "completed" in any meaningful way until that date. <u>Id.</u> That

difference of opinion as to the proper date to consider does not support a claim that the hearing

officer's factual findings were not "regularly made."

      Contrary to plaintiffs' argument, the record shows that the hearing officer's fact-finding

process was normal and thorough. He opened the hearing to the public at C.D.'s Mother request

and allowed both sides to make opening statements, introduce evidence, and present and cross-

examine witnesses. <u>See</u> AR 329 at 006. He frequently asked his own questions of witnesses to

clarify issues and permitted an additional day of witness testimony to accommodate the

testimony of the last of plaintiffs' 27 witnesses. The resulting decision is sufficiently detailed

and includes findings that are dispositive of the issues in the case. In his decision, the hearing officer identified the correct central issues presented, id. at 007; accurately summarized witness testimony, id. at 008–022; outlined the relevant legal standards, id. at 022–026, 030–034, 036–038, 041, 044–049; found one issue in plaintiffs' favor; and included findings of fact and legal conclusions, id. at 008–022, 022–048. Although factual findings that are prima facie correct may be rebutted, plaintiffs have not offered persuasive evidence that the hearing officer's factual findings were not regularly made or that there were any material errors in his report.

### G. IEPs' Reliance On 2018 Testing

The next claim is that "APS's 2021–2022 and 2022–2023 IEPs denied [C.D.] a FAPE by failing to meet [his/her] individual needs by continuing to rely on outdated assessments to develop [his/her] IEPs." [Dkt. No. 1] at 34. This claim incorporates the same issue raised in the first claim; namely, that the reassessment was insufficiently comprehensive. The insufficiency of those assessments was to some extent contradicted by the psychoeducational report prepared on May 28, 2023 by Dr. Henley, who found that C.D.'s testing results were "very consistent with prior testing that documented areas of academic weakness, including math computations and reading comprehension." AR 163-014. Dr. Henley's finding supports a conclusion that the information the IEP used to develop C.D.'s final senior year IEP was based upon appropriate testing. AR 163-014. The APS psychologist, Amy Cannava, agreed that the IEE report was "extremely consistent" with the data the IEP team reviewed to develop C.D.'s final IEP. As discussed above, the IEP team considered several types of data when developing C.D.'s IEPs, including current school test scores, teacher input, C.D.'s Mother's input, and C.D.'s junior year SOLs. It is misleading to say that the APS "relied on outdated assessments to develop [C.D.]'s IEPs" because that implies that no current data was used, which was not the case. For these reasons and those addressing the first claim, the hearing officer's decision will be affirmed.

### H. IEP Vagueness

The Complaint's final procedural claim is that the "[March 17, 2022] IEP and subsequent [] IEPs denied [C.D.] a FAPE because the provisions [] for specially designed instruction [SDI] were so vague that the Parent could not properly evaluate the school's offer of FAPE or monitor over time whether the school was actually providing those services." Id. at 35. The IDEA requires that IEPs contain, inter alia, a "statement of the special education and related services . . . to be provided to the child . . . ." 20 U.S.C. § 1414(d)(1)(A)(i)(IV).

Plaintiffs' argument centers on a formatting change that the IEP form underwent beginning with the March 17, 2022 IEP. Before March 17, 2022, C.D.'s IEPs' "Services" section listed under the SDI disability category the skills and academic subjects in which support hours were to be provided (e.g., organization, mathematics, etc.). Beginning on March 17, 2022, the IEPs' "Services" section listed simply "SDI" without identifying academic subjects. Standing alone, the updated "Services" section would have been too vague to satisfy the IDEA; however, as the hearing officer concluded, courts look "to the entire IEP development process to determine whether the offerings were sufficiently clear." A.P., 2022 WL 1105076, at *9. In addition to the "Services" section, the IEP also contained lists of "Needs" and "Goals," both of which provided details comparable to what had been contained in the previous IEP forms, including breakdowns by subject. AR 329 at 035.[17] After examining the IEPs in their entirety, the hearing officer concluded that "each IEP was sufficiently specific to enable [C.D.'s] Mother

---

[17] For example, the March 17, 2022 IEP listed as a reading comprehension need: "[C.D.] needs support and prompting to read grade level text, process it, and understand its meaning." AR 80-006. In the same IEP, C.D.'s reading comprehension goal was, "when given grade level text, [to] demonstrate comprehension of reading in all content area classes, by answering oral/written comprehension questions with >80% accuracy on 4 out of 5 opportunities measured quarterly." Id. at 009.

to decide whether to accept or challenge the school district's offer." Id. at 34.  The Court finds

that the hearing officer's conclusions that C.D.'s IEPs, including the March 17, 2022 IEP, were

not vague and did not deny C.D. a FAPE were based on substantial evidence and a correct view

of the law.

## I.  2021–2022 and 2022–2023 IEPs

The Complaint's last three claims are that the 2021–2022 and 2022–2023 IEPs

substantively denied C.D. a FAPE by:

A.  failing to meet C.D.'s individual needs by denying C.D. the special education
and related services necessary to prepare C.D. for future education;

B.  reducing specially designed instruction services year after year with no
objective data to support this reduction in service; and

C.  providing no reading, writing, or math remediation to C.D. during the service
minutes identified in C.D.'s IEPs despite documented evidence of C.D.'s
deficits in these areas.

[Dkt. No. 1] at 39, 42–43.

In Endrew, the Supreme Court held that "[t]o meet its substantive obligation under the

IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress

appropriate in light of the child's circumstances."  580 U.S. at 399.  An IEP typically should be

"reasonably calculated to enable the child to achieve passing marks and advance from grade to

grade."  Id.  This decision reaffirms a related principle in Hendrick Hudson Central School

District v. Rowley that an IEP must be "reasonable" but does not have to be "ideal."  458 U.S.

176, 206–07 (1982).  Additionally, the "IDEA requires great deference to the views of the school

system rather than those of even the most well-meaning parents."  A.B., 354 F.3d at 328; see also

Endrew, 580 U.S. at 404.  "For a child fully integrated in the regular classroom, an IEP typically

should, as Rowley put it, be 'reasonably calculated to enable the child to achieve passing marks

and advance from grade to grade.'"  Endrew at 401 (quoting Rowley, 458 U.S. at 204); see also

A.B. by L.K. v. Smith, No. 22-1686, 2023 WL 3533595, at *2 (4th Cir. 2023) ("When a child is fully integrated into the regular classroom, appropriate progress is 'passing marks and advance[ment] from grade to grade.'") (citing Endrew, 580 U.S. at 401).

The hearing officer found that the APS offered C.D. a FAPE for the 2021–2022 and 2022–2023 school years by providing appropriate IEPs "reasonably calculated to enable C.D. to achieve passing marks and advance from grade to grade." AR 329 at 040. C.D. was almost entirely integrated into general education classrooms, received mostly A's and B's during C.D.'s junior and senior years, and graduated with a standard diploma.[23] C.D.'s April 23, 2021 IEP provided for 3.75 hours per week of SDI in the special education setting for "organization" and 9 hours per week in the general education setting. Later IEPs—those governing primarily the 2022–2023 school year—were similarly structured but with only five hours per week of support in the general education setting. The hearing officer found that C.D.'s Mother failed to show at the hearing that any of the challenged IEPs was inappropriate for C.D., and that she "did not offer expert testimony concerning the alleged inappropriateness" of the IEPs. Id. at 039. The APS, by contrast, put forward a witness certified as an expert in special education who testified that the IEPs were appropriate. Id. at 039.

A school district provides a FAPE by providing and implementing "an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." Endrew, 580 U.S. at 399. The IDEA does not require that a school district provide the best

---

[23] There is some evidence in the record that C.D. was on track to graduate with an advanced diploma had C.D. retaken the failed math course during summer school following the junior year. See AR 197-005–06 (email exchange between C.D.'s Mother and C.D.'s school counselor, Kelly Carruthers, in which C.D.'s Mother lists summer school as an option to keep C.D. on track for an advanced diploma but states, "[u]nder no circumstances, does [C.D.] want to take summer school").

possible education but a sufficient one.  C.D.'s circumstances and the progress C.D. made by advancing from grade to grade, actually staying on track for an advanced diploma through the junior year, and ultimately achieving a standard diploma show that C.D. received a FAPE.

### III. CONCLUSION

For all these reasons, defendant's Motion for Judgment on the Administrative Record [Dkt. No. 63] will be GRANTED, plaintiffs' Motion for Judgment on the Administrative Record [Dkt. No. 58] will be DENIED, the hearing officer's decision will be affirmed in all respects, and judgment will be entered in defendant's favor by an Order to be issued with this Memorandum Opinion.

Entered this 30 day of January, 2025.

Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge